Filed 10/29/20  P. v. Ibach CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY WILLIAM IBACH,<br>    Defendant and Appellant. | A158432<br><br>(Sonoma County Super.<br> Ct. No. SCR715405) |

Anthony William Ibach appeals from his conviction after a jury trial of the voluntary manslaughter of Corey Vaughn with a knife, for which Ibach was sentenced to seven years in state prison.  Ibach makes three claims of error:  that the trial court (1) prejudicially abused its discretion by admitting the evidence of Ibach's previous uncharged acts of violence; (2) prejudicially erred in instructing the jury, thereby fatally undermining his theories of self-defense; and (3) erred by imposing certain fines and fees.  We conclude the trial court did not abuse its discretion in admitting the uncharged acts evidence; Ibach's instructional error claim lacks merit; and Ibach has forfeited his claim of error regarding fines and fees.  We therefore affirm.

1

## BACKGROUND

In a November 2018 information, the Sonoma County District Attorney charged Ibach with the murder of Cory Allen Vaughn (Pen. Code, § 187[1]) and alleged that Ibach both personally used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)), and personally inflicted great bodily injury on Vaughn (§§ 1203.075, 12022.7). A jury trial followed in May 2019, at which Ibach claimed he acted in self-defense when he killed Vaughn during a mid-day fight on April 21, 2018.

## I.

### *Events Leading Up to April 21, 2018*

Ibach and Vaughn were young men who had attended the same high school in Sebastopol, California and knew people in common, including many of the witnesses we will discuss. Around the 2018 New Year, Ibach became upset that Osiris Zamora had sold a PlayStation 4 console to another person, who had made a higher bid for it than Ibach had. He exchanged hostile messages with Zamora and Zamora's close friend, Vaughn, using the mobile software application Snapchat. On January 30, 2018, Ibach implied to Zamora that they should fight, saying he "really aint hard to find." Vaughn responded that same day, stating, "I seen screen shot who think you is bruh on sum Sum gangsta shit," and, apparently regarding Zamora, "You know he my folks, you got problems with him [unintelligible] me to[o]." The next day, Ibach asked Vaughn what his "beef" was, and Vaughn wrote back about "knocking mfs down." Ibach responded that he had known Zamora since childhood and added, "U know where i stay. I know where u stay. Make your move." Vaughn called Ibach a "Pussy boi" who would get "smacked." Ibach

---

[1] Statutory references are to the Penal Code unless stated otherwise.

said he had never disrespected or crossed Vaughn and repeated, "Make your move."

Ibach did not have any more contact with Zamora or Vaughn until April 21, 2018. That day, a party was held at a Sebastopol apartment to celebrate the local Apple Blossom Festival, where about 30 people drank liquor and played games. Zamora testified that he drove with Vaughn to a restaurant parking lot next door to the apartment complex, parked and walked toward the party. He saw Ibach walk from the complex's driveway to the parking lot and stand by his car. Zamora and Vaughn said "what's up" to Ibach from a distance, and Ibach pulled out bear mace. Vaughn told him to put it away and "get the fuck out of there." Zamora told Vaughn that Ibach was a "pussy" and that they should go to the party, and the two left.

Andy Noonan, one of the party attendees, testified that he also drove to the restaurant parking lot, where Ibach drove up and asked Noonan where the party was located, said he had a "beef" with Vaughn, walked around looking angry with a large flashlight and eventually drove away. While Noonan was at the party, Ibach sent him a Snapchat message that he wanted a "2x2," meaning a fight of two against two. Noonan responded that he did not want to be involved. He did not talk about this exchange with Vaughn, but saw Vaughn leave a short time later, "probably" because of what Noonan told someone else. Noonan left to watch what he expected would be a fight, along with Mark Ainger, Zamora and Haley Graham.

Ibach was by his car in the restaurant parking lot with another man, Okeem Pusey. Pusey testified that Ibach, with whom he had become friendly after moving to the area a few years before, picked him up around noon that day to get something to eat. They had no plan to go to Sebastopol, and Pusey did not pay much attention to where Ibach was driving. Instead, he looked at

3

his phone and slept. Then, Pusey noticed Ibach drive into an open parking lot, park and talk on a speaker phone to a male about two guys who had threatened him, and say, "tell them to come out." Pusey surmised from Ibach's phone conversation that they were there because Ibach had had problems with some people. Pusey decided not to fight. He saw "a lot of people walking out to the parking lot," including people with their shirts off. Ibach reached for a wooden baseball bat in the back of the car, but Pusey took it and put it behind his seat, and the two got out of the car.

## II.

### *The Fight*

Several witnesses testified about the fight and the events leading up to it, and a video recording taken on a mobile phone depicting some of the fight was played for the jury. It is not disputed that upon reaching the restaurant parking lot Zamora verbally confronted Pusey; Pusey indicated he was not going to, and did not, fight; Vaughn and Ibach were in a confrontation with each other and moved around the parking lot (whether or not others joined in the confrontation); Vaughn did not have a weapon and Ibach did not brandish one during the fight; the confrontation lasted a matter of moments; at the end of the fight, Ibach took out a knife and slashed Vaughn twice in the torso; Ibach then ran to his car and drove away; and Vaughn fell to the ground bleeding heavily and died there from a wound to the heart. The parties debate who was the aggressor in the fight and whether more people than just Vaughn fought and/or acted aggressively toward Ibach.

The testimony of Jared Ostello, Haley Graham, Mark Ainger, Zamora and Noonan provided support for the prosecution's position that Ibach acted aggressively and that only he and Vaughn fought. Ostello testified that he knew Vaughn and Ibach, he was best friends with Noonan and he was

4

Graham's cousin, and he recorded the video on his phone that the jury viewed. He said Ibach and Vaughn yelled at each other in the restaurant parking lot and Vaughn took off his shirt. No one else was immediately around Ibach. Vaughn and Ibach moved around the parking lot swinging at each other without landing punches and the fight became more intense. Vaughn, whom Ostello had seen fight well before, seemed to be fighting defensively. Ibach said "get back" just before he slashed Vaughn with a knife.

Graham, who was in a relationship with Noonan that extended back to the time of the fight, testified that Vaughn and Ibach started throwing punches at each other in the restaurant parking lot, but she did not recall any punches landing. She added that Vaughn moved backwards but was getting the better of Ibach before he was stabbed, the people watching were "pretty far" from Vaughn and Ibach, and no one else fought.

Ainger testified that he was close friends with Vaughn, who died in his arms, and that he did not know Ibach. At the party, after someone called Noonan about fighting, Vaughn told Ainger to come with him and went outside. Ainger, who had his shirt off at some point, went outside to make sure that Vaughn was safe. He saw Vaughn and Ibach argue and swing at each other. He got between them to break up their fight, but he stopped when others said to let them fight one on one. He did not put his hands on Ibach and did not see anyone else join in the fight.

Zamora testified that while he was at the party he had conversations with Vaughn, Ainger and Noonan; that Noonan led him to believe he was supposed to go outside and fight; that he went outside after Vaughn ran out; that when he reached the restaurant parking lot, Vaughn and Ibach were throwing punches at each other, with some connecting, as Ainger stood 10 to

5

15 feet away; and that no one else joined in the fight or tried to stop it. Zamora said he looked away from the fight for a moment and when he turned back Vaughn had two big gashes on his torso. Zamora tried to stop Ibach, but he ran to his car and drove away.

Andy Noonan testified that he was equally friendly with Ibach and Vaughn. He and others left the party to watch the fight, and when he reached the restaurant parking lot, Vaughn and Ibach were already squared off and shuffling around. He did not see them throw any punches or see anyone else fight, but he did see Ibach "slice" Vaughn and run away.

The video taken by Ostello, which is not itself in the record, was less than 40 seconds long, and showed Vaughn and Ibach confronting each other while others stood further away. As indicated in testimony about the video by Ostello and photographic stills from it, Vaughn and Ibach were somewhat apart from the others as they squared off against each other. A transcript of the video given to the jury to aid its review of the video is contained in the record, and it indicates that one or more "unidentified male[s]" said, "Back the fuck up!," "Back up!" and, "Let him have it!"

The testimony of Pusey and a restaurant employee provided support for Ibach's position that Vaughn and others acted aggressively towards him. Pusey testified that a group of about six people, including two men with their shirts off, approached Ibach and him as they stood by Ibach's car in the parking lot. One of the men said to Pusey, "[Y]ou have problem with my homie, you have problem with my homie?" When Pusey said he was not there to fight, the two men, standing side by side, approached Ibach, who was standing behind Pusey. Graham approached Pusey and, when he expressed concern, told him not to worry and that she would calm them down. As the two men surrounded Ibach, Ibach yelled, "Get back."

6

To Pusey, Vaughn and Ibach appeared ready to fight. He did not see either throw any punches but saw both "puff up." The other shirtless man who had approached Ibach with Vaughn stood a few feet or more from Ibach. Pusey saw Ibach back up and saw someone try to break up the fight. Pusey turned away from the fight and, still talking to Graham, heard Ibach yell, "Get back," three or four times. At some point, Pusey saw that Ibach was backing up and swinging with his right hand, and then saw Vaughn on the ground, bleeding badly.

The restaurant employee testified that he drove his car into the restaurant parking lot and saw Ibach and a man standing by a car in the lot. He parked in the same row, six car stalls away from them and there was one car parked between them. A group of four or five men went up to Ibach and started punching him, "ganging up on him." Ibach backed up and they all moved around the lot. One attacker took off his shirt, and the entire group continued to swing at Ibach. As the group moved away from him, the employee exited his car to continue to see what was happening. Near the end of the confrontation, he could not always see everything clearly, but he saw the group continue to swing at Ibach, one of the men fall, bleeding, and Ibach run to his car.

## III.

### *Ibach's Fleeing and Arrest*

A friend of Ibach's testified that on the afternoon of April 21, 2018, Ibach came to his house in bloodied clothes and said he had just fought someone. He changed into some of the friend's clothes and washed up in a bathroom. At Ibach's request, the friend drove him to a girlfriend's residence in San Rafael. The friend moved Ibach's car off his property to a dead-end street and later told investigators that he removed items from the car,

7

including a wooden baseball bat.  The friend pleaded guilty to a misdemeanor accessory count related to these events.

Surveillance video from the friend's house showed Ibach's car pulling into the driveway on April 21, 2018, at 12:45 p.m., and the two leaving the residence at 1:17 p.m.  The residence was located five minutes away from the restaurant parking lot.

A San Rafael police officer testified that he contacted Ibach in a San Rafael park at around 3:00 p.m. on April 21, 2018, and Ibach said that his name was "Peyton."  Later that day, the officer saw a bulletin that included Ibach's photograph, located Ibach and, after Ibach acknowledged his true identity, arrested him.

After his arrest, police photographed Ibach, who had no visible injuries other than marks consistent with having worn handcuffs.  Police found Ibach's car parked about a half mile from the residence of the friend he visited just after the fight.  They recovered a wooden baseball bat from the friend's vehicle.

## IV.

### *Previous Uncharged Violent Acts by Vaughn and Ibach*

The defense presented two witnesses who testified about previous uncharged violent acts by Vaughn.  A high school football teammate testified that at an October 2015 party, Vaughn argued with the father of the party host and sucker punched another person at the party.  The teammate stepped in to defuse the confrontation with the father.  When the teammate later left the party, Vaughn followed him, knocked him to the ground and kicked him until he lost consciousness and was concussed.

Another defense witness testified that he had gone to high school and been friends with both Ibach and Vaughn.  About a year and a half before

8

trial, he had met Vaughn to fight him over a dispute between them. He brought Ibach in case Vaughn's friends jumped him. During the fight, two of Vaughn's friends, urged on by Vaughn, attacked him. He fell to the ground and the three kicked him until Ibach drove them away with a stick.

In rebuttal, the prosecution introduced Snapchat messages from Ibach indicating he had engaged in uncharged acts of violence before April 21, 2018.

## V.

### *Verdict, Sentencing and Appeal*

The jury found Ibach not guilty of murder but guilty of the lesser-included offense of voluntary manslaughter (§ 192) and found that he had personally used a knife. The court sentenced him to seven years in state prison, consisting of six years for voluntary manslaughter and one year for personal use of a knife. It awarded him presentence custody and conduct credits and ordered him to pay certain fines and fees.

Ibach filed a timely notice of appeal.

### DISCUSSION

### I.

### *The Court Properly Admitted Evidence of Ibach's Previous Acts of Violence.*

Ibach first argues the trial court erred by allowing the prosecution to present in rebuttal Snapchat messages in which he indicated he had engaged in uncharged acts of violence before April 21, 2018. We disagree.

#### A. Relevant Proceedings Below

Prior to trial, the prosecution sought to introduce a 29-page document that listed a large number of Snapchat messages dating back to October 2017 by and to Ibach (in addition to those between Ibach, Zamora and Vaughn, admission of which the defense did not oppose) in order to rebut defense evidence of Vaughn's prior uncharged acts of violence. After Ibach, through

9

his counsel, objected based on Evidence Code section 352, the prosecution reduced the number of messages it sought to introduce. Ibach continued to object to admission of the remaining messages, citing Evidence Code section 352 and section 1103, which govern admission of evidence of prior uncharged acts of violence. After an unrecorded chambers discussion, the court stated that many of the messages, while not admissible under section 1103, "may likely be admissible in rebuttal under a different theory based on defense case or argument, evidence put on by the defense," and that the issue could be further addressed during trial.

At trial, after the defense presented the testimony of its two witnesses regarding Vaughn's past uncharged acts of violence, the prosecutor sought to admit a five-page document containing certain Snapchat messages from Ibach's account (which also included the messages we have already quoted between Ibach, Vaughn and Zamora). The prosecution argued the messages demonstrated prior acts of violence by Ibach that were admissible under Evidence Code section 1103. Defense counsel objected under section 352. The court allowed the prosecution to introduce the Snapchat messages under Evidence Code section 1103 as rebuttal to the defense evidence, concluding they were not confusing or misleading and were probative of the issues brought up by the defense, and noting that the prosecution had greatly reduced the number of messages it had initially sought to introduce.

Ibach argues the court improperly admitted messages between himself and "andynoonan6" or "Vandough," both of whom Ibach contends were Noonan. The first was a message on October 21, 2017, in which Ibach wrote to andynoonan6 that "awhile go" someone said he was going to "stomp" on Ibach and "[I] went to his front door yesterday and he was so scared he wouldnt even come outside so he called his dad up and me and my homies

10

punked his dad," who was "crying and called the cops," and "got fucked up." On December 21, 2017, Ibach wrote to Vandough that the previous night "[t]hose niggas should of killed me an my boy . . . cuz we comin back now they getting touched fasho." On December 25, 2017, Ibach wrote to Vandough, "Just pulled up one of the niggas that stuck my homeboy," "[s]ocked him in his mouth," and "got his tires."

The court instructed the jury regarding these messages, "If you decide that the defendant committed the specific acts of violence, you may, but are not required to, consider that evidence for the limited purpose of deciding whether the defendant acted in conformity with that character or trait of character. If you conclude that the defendant committed the specific acts of violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder. Do not consider this evidence for any other purpose."

**B. Relevant Legal Standards**

Evidence Code section 1101, subdivision (a) prohibits the admission of evidence of a person's character when offered to prove his or her conduct on a specified occasion. However, both Evidence Code section 1101, subdivision (b) and Evidence Code section 1103 provide relevant exceptions to this prohibition.

Evidence Code section 1101, subdivision (b) allows for "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact," including motive and intent, "other than his or her disposition to commit such an act." The California Supreme Court has held that Evidence Code section 1101, subdivision (b) permits admission of " '[e]vidence that a defendant committed crimes other than those for which he [or she] is on trial is admissible when it is logically, naturally, and by

11

reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.] The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect. [Citation.] When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667.)

Evidence Code section 1103 provides further exceptions to the bar against character evidence contained in Evidence Code section 1101, subdivision (a). Section 1103, subdivision (a)(1) provides that "evidence of the character or trait of character . . . of *the victim*" is not made inadmissible by Evidence Code section 1101 if a defendant offers such evidence to prove conduct of the victim in conformity with the character trait. (Italics added.) Evidence Code section 1103, subdivision (b) provides that "evidence of the *defendant's* character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)." (Italics added.)

Even if evidence is admissible under section 1103, subdivision (b), however, it should be excluded under Evidence Code section 352 if the probative value of the evidence is substantially outweighed by its prejudicial effect. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) The prejudicial effect is of a very specific kind. As the California Supreme Court has explained, " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.)

### C. Analysis

Ibach argues the trial court abused its discretion under Evidence Code section 352 by admitting the challenged Snapchat messages. He argues the messages were not sufficient evidence that he had actually committed violent acts, particularly in the absence of any details or other evidence that he committed the vaguely described acts, the lack of any charges against him, and that the messages were remote in time, dissimilar to the charged acts and of little probative value.

We disagree. The challenged messages were sufficiently similar to those Ibach sent Zamora and Vaughn in early 2018 when their dispute erupted to be probative of Ibach's motivation and intent in fighting Vaughn—a key issue given the charge of murder and Ibach's claim of self-defense.

13

Further, the messages described acts by Ibach that were similar to his acts with Vaughn, meaning violent confrontations initiated by Ibach. The messages were not particularly remote in time, being from 2017, the year before Ibach killed Vaughn. They discussed matters that do not appear to have been more remote in time than Vaughn's past uncharged violent acts described by defense witnesses, who testified Vaughn had engaged in acts a year and a half before the May 2019 trial and in 2015. As to whether Ibach actually committed these acts, his own messages indicate he did and any doubt about the messages pertained to the weight of the evidence and not its probative nature. We presume the jury followed the court's instruction to determine for itself whether or not Ibach committed the acts and, if it found he did, consider them for a limited, non-dispositive purpose. (See *People v. Holt* (1997) 15 Cal.4th 619, 662 ["[j]urors are presumed to understand and follow the court's instructions"].) In short, the trial court acted well within its discretion in admitting this evidence.[2]

## II.

### *Ibach Fails to Show Instructional Error.*

Ibach next argues that the trial court erred by instructing the jury with CALCRIM No. 3472 because the instruction misstated the law in light of the evidence in his case, thereby prejudicing him in light of his theories of self-defense. The People contend Ibach has forfeited this claim and that there was no error. We conclude that, assuming no forfeiture for the sake of argument, Ibach has not shown instructional error.

### A. Relevant Proceedings Below

Along with a number of instructions regarding self-defense and imperfect self-defense, the court instructed the jury with CALCRIM No. 3472

_____

[2] In light of this conclusion, we need not address Ibach's prejudicial error argument.

14

as follows:  "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force."  At the hearing on jury instructions, Ibach's counsel objected to this instruction for lack of evidence that Ibach intended to create an excuse to use force.  The trial court disagreed, noting the evidence that Ibach sent Noonan a message that he wanted to engage in a "2x2" and that he was armed with a knife when he fought Vaughn.  Defense counsel pointed to evidence that Ibach repeatedly retreated during his fight and said "back up" before stabbing Vaughn.  The court responded that the evidence was "mixed" in that some of it indicated Ibach retreated and some indicated Ibach and Vaughn "were fighting and that during the course of the fight they moved around the parking lot and it wasn't a retreat."  The court continued, "I think it just depends on which witness the testimony comes from and that's for the jury to decide."  It overruled the defense objection to CALCRIM No. 3472.

**B. Analysis**

Ibach's only objection below to the court's CALCRIM No. 3472 instruction was that there was no substantial evidence to support it.  That argument was patently meritless in light of the evidence that Ibach provoked the fight by confronting Vaughn outside the party holding bear mace and messaging Noonan that he wanted to engage in a "2x2," and that Ibach, shortly after squaring off to fight the unarmed Vaughn one-on-one, pulled out a knife and fatally stabbed him.

On appeal, Ibach abandons that argument and instead, relying on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*) and *People v. Eulian* (2016) 247 Cal.App.4th 1324 (*Eulian*), contends the instruction was an incorrect statement of law given the facts of his case supporting his self-defense theories, and that the trial court failed in its sua sponte duty to

15

instruct completely and accurately on the law. (See *People v. Fiu* (2008) 165 Cal.App.4th 360, 370 [court has sua sponte duty to instruct with a "complete and correct statement of the law"]; *People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386 [defendant has the right to an instruction that pinpoints the theory of the defense]). He points to the evidence that Ibach "retreated and repeatedly told Vaughn to back up, before [Ibach] stabbed him with a knife," and also cites the restaurant employee's testimony that a group of men ganged up on Ibach and punched him and the defense witnesses' testimony of Vaughn's past uncharged acts of violence. His argument is unpersuasive.

In *Ramirez*, on which Ibach primarily relies, the defendants were convicted of murder and appealed, arguing the trial court's instruction of the jury under CALCRIM No. 3472 erroneously prevented the jury from considering their claim of self-defense. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 943.) Defendants were brothers. With one of them armed, they went with a friend in search of a rival gang's members after the gang had harassed some of their family, possibly to talk with one of the members about stopping the harassment. When they came upon several rival gang members, a fistfight broke out, which may have been at their own instigation. The brother who was armed testified that he saw the victim, a member of the rival gang, walk toward the group that was fighting and raise his hand, "holding an object that 'looked like a gun.' [The armed brother] pulled his gun from his sweatshirt pocket and fatally shot [the victim]." (*Id*. at pp. 944-945.) The defendants claimed the shooter had reacted in self-defense and to defend his brother and friend. (*Id*. at p. 945.)

The trial court gave the same CALCRIM No. 3472 instruction that was given to the jury in this case. (See *Ramirez*, *supra*, 233 Cal.App.4th at

16

p. 945.)  The prosecutor in *Ramirez* "highlighted the instruction in closing argument" and "argued it precluded any claim of self-defense even if defendants only instigated a fistfight." (*Id*. at p. 946.)  On appeal, the defendants argued the instruction prevented the jury from considering their self-defense claim, and that the error was compounded by the prosecutor's repeated misstatements of the law. (*Id*. at p. 945.)  The appellate court agreed with the defendants and reversed, concluding that "under the facts before the jury," CALCRIM No. 3472 "did not accurately state governing law." (*Id*. at p. 947.)  "A person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby 'forfeit[ ] . . . his right to live.'  [Citation.] Instead, he may defend himself 'even when the defendant set in motion the chain of events that led the victim to attack the defendant.' " (*Id*. at p. 943.) The *Ramirez* court observed that CALCRIM No. 3472 was generally a correct statement of law, but concluded it was not correct *when considered in light of the specific circumstances of that case*.  By giving that instruction without more, the appellate court held, the trial court violated its "sua sponte duty to instruct the jury on an affirmative defense 'even in the absence of a request, "if it appears the defendant is relying on such a defense," ' as here, ' "or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " (*Ramirez*, at p. 949.)

The circumstances in *Ramirez* are quite different than the ones before us.  The *Ramirez* court was concerned about the evidence, mostly the testimony of the brother who was armed, that could be construed as showing that even if the defendants might have instigated a fistfight with members of the rival gang, the brother shot the victim in self-defense when the victim held up what he thought was a gun.  There is no comparable evidence here.

17

There is no evidence that the victim, Vaughn, or anyone else at the scene other than Ibach had a weapon or displayed or used anything that looked like a weapon. There is no evidence that anything other than fists were used before Ibach pulled out the knife. Ibach argued, based on the restaurant employee's testimony, that several people pummeled him with their fists in the restaurant parking lot, that he shouted to get back repeatedly before he stabbed Vaughn, and that he knew Vaughn had a violent nature because he had witnessed a fight in which Vaughn and two friends ganged up on a friend of Ibach's. None of this evidence shows that Ibach acted in the face of anything resembling deadly force. Even the restaurant employee, whose testimony was most helpful to Ibach, did not testify that he saw anyone display any weapons during the fight, that Ibach got knocked down or that Ibach was otherwise injured. Absent evidence of deadly force or any reason to put Ibach in fear of serious bodily injury or death, Ibach's directive to Vaughn to "get back" was insufficient to support an escalation theory like that raised by the evidence in *Ramirez*. The only evidence of escalation here was the testimony that Ibach suddenly pulled a knife and fatally stabbed Vaughn.

Under *these* circumstances, the trial court's CALCRIM No. 3472 instruction was not a misstatement of law and the court had no sua sponte duty to modify it. As Ibach concedes, the *Ramirez* court acknowledged that CALCRIM No. 3472 was generally a correct statement of the law. (*Ramirez, supra*, 233 Cal.App.4th at p. 947 ["True, CALCRIM No. 3472 states a correct rule of law in appropriate circumstances"].) Further, the court in *Eulian*, the other case that Ibach relies on, concluded, "CALCRIM No. 3472 *is generally a correct statement of law, which might require modification* in the rare case in which a defendant intended to provoke only a non-deadly confrontation and

18

the victim responds with deadly force." (*Eulian*, *supra*, 233 Cal.App.4th at p. 1334, italics added.)[3]

For these reasons, we reject Ibach's claim of instructional error.[4]

## III.

### *Ibach Has Forfeited His Challenge to Certain Fines and Fees.*

Finally, Ibach argues that the trial court erred by imposing certain fines and fees at sentencing without holding a hearing to determine whether he had the ability to pay them. The People argue Ibach has forfeited this claim by failing to object to any of the fines and fees below, and that his claim lacks merit. We conclude that Ibach has forfeited his claim.

At sentencing, the court, among other things, imposed a $2,100 restitution fund fine (§ 1202.4, subd. (b)), a $2,100 parole revocation fine that it suspended unless parole was revoked (§ 1202.45), a $30 court facilities assessment fee (Gov. Code, § 70373) and a $40 operations assessment fee (§ 1465.8, subd. (a)(1)). Ibach did not object to any of these fines and fees.

Nonetheless, Ibach argues that his federal and state constitutional rights to due process rights and equal protection, and his constitutional protections against cruel and unusual punishment, required the trial court

---

[3] Indeed, while we have no need to address the forfeiture issue, this appears to be the kind of circumstance which our Supreme Court has repeatedly determined requires a defendant to object and request the trial court modify its instruction in order to preserve a claim of error on appeal. (See, e.g., *People v. Rundle* (2008) 43 Cal.4th 76, 151 ["[t]he longstanding general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Guiuan* (1998) 18 Cal.4th 558, 570 [failure to object at trial resulted in forfeiture of claim that instruction was " 'too general or incomplete' "].)

[4] In light of our conclusion, we do not address Ibach's prejudicial error argument.

determine his ability to pay these fines and fees before imposing them. He contends that, despite his lack of objection below, we should consider his claim because it raises significant issues with constitutional implications, as seen by a divide between the appellate courts that is presently under consideration by our Supreme Court, and because a defendant cannot forfeit an unauthorized sentence. We disagree.

Generally, " ' " 'a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " ' [Citation.] 'Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal.' [Citation.] ' "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" ' [Citation.] Additionally, '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.' " (*People v. McCullough* (2013) 56 Cal.4th 589, 593.)

As the People note, our Supreme Court has repeatedly held that, where a trial court imposes statutory fines and fees without determining a defendant's ability to pay—including restitution fines under section 1202.4— a defendant who fails to object to these fines and fees in the trial court forfeits appellate claims asserting the need for such a determination. (*People v. Avila* (2009) 46 Cal.4th 680, 729 [claim that trial court erroneously imposed a restitution fine under former section 1202.4 that the defendant did not have the ability to pay]; *People v. Gamache* (2010) 48 Cal.4th 347, 409 [claim that the trial court erroneously imposed a restitution fine without considering the defendant's ability to pay]; *People v. Aguilar* (2015)

20

60 Cal.4th 862, 865-869 [claim that trial court erroneously did not determine the defendant had the ability to pay probation fines and attorney fees before imposing them]; *People v. McCullough*, *supra*, (2013) 56 Cal.4th at pp. 593-597 [claim there was insufficient evidence that the defendant had the ability to pay a jail booking fee]; *People v. Nelson* (2011) 51 Cal.4th 198, 227 [claim that trial court imposed a restitution fine without considering the defendant's ability to pay]; *People v. Wall* (2017) 3 Cal.5th 1048, 1074-1075 [recognizing the validity of the forfeiture found in *Avila* and *Gamache*].)

Ibach does not address this California Supreme Court authority. Instead, he argues we should consider his claim for two reasons. First, we should exercise our discretionary authority to consider his claim because it presents significant issues with constitutional implications as seen in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) and the subsequent split in the appellate courts over its holding, reflected by our Supreme Court's grant of petition for review in two recent cases, *People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*), rev. granted, November 13, 2019, S257844, and *People v. Belloso* (2019) 42 Cal.App.5th 647 (*Belloso*), rev. granted, March 11, 2020, S259755. We decline to exercise our discretionary authority because none of these cases involved the circumstances before us, which favor a finding of forfeiture.

In *Dueñas*, the defendant requested a hearing to determine her ability to pay certain fines and fees, including a restitution fee imposed under section 1202.4, contending she was homeless and receiving public assistance. (*Dueñas*, *supra,* 30 Cal.App.4th at pp. 1162-1163.) The trial court did not hold a hearing, instead telling her regarding some of the fees that a hearing could be held in the future if needed and that, if she could not pay other fines and fees, including the restitution fine, she would not be "punished" because

21

they would go to collections without any further order of the court. (*Id.* at p. 1163.) The Second Appellate District held that, under these circumstances, due process of law required the court to hold a hearing to determine the defendant's ability to pay these fines and fees. (*Id.* at p. 1164.)

In *Kopp*, the appellate court reversed the defendants' convictions on one of a number of counts based on a jury instruction error and vacated defendants' sentences. (*Kopp, supra,* 38 Cal.5th at p. 56.) In that context, the court, relying on *Dueñas,* held that on remand the trial court should determine the defendants' ability to pay any assessments and fines before imposing them, to which all parties agreed. (*Kopp,* at p. 57.) Our Supreme Court granted a petition to review by one of the *Kopp* defendants to determine two questions: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?" (*People v. Kopp* (2019) 254 Cal.Rptr.3d 637, 2019 Cal. LEXIS 8371 [Nov. 13, 2019, S257844].)

In *Belloso,* the same court that decided *Dueñas* recognized a split in appellate authority regarding the correctness of *Dueñas* on the ability to pay issue, and reaffirmed its holding. (*Belloso, supra,* 42 Cal.App.5th at p. 649.) Belloso did not object in the trial court to the imposition of the assessments and fees he challenged on appeal; nonetheless, the court held he did not forfeit his *Dueñas*-based appellate claim because he was sentenced before *Dueñas* was decided and could not have reasonably anticipated its holding at the time of trial. (*Belloso,* at p. 662.) The court held that the trial court should have held an ability to pay hearing regarding the challenged fines and fees and remanded the matter to give the defendant an opportunity to present evidence of his inability to pay. (*Id.* at pp. 654-656, 663.) Our

22

Supreme Court granted the People's petition for review of the ability to pay issue and deferred action on it pending its disposition of *People v. Kopp*, *supra*, 254 Cal.Rptr.3d 637. (*People v. Belloso* (2020) 254 Cal.Rptr.3d 418 [Mar. 11, 2020, S259755].)

The procedural circumstances before us do not involve any of those present in these three cases, rendering those cases inapposite regarding the forfeiture question. Unlike in *Dueñas*, Ibach made no objection to the court's imposition of the challenged fines and fees; unlike in *Kopp*, sentencing was not vacated and the matter was remanded for other reasons; and unlike in *Belloso*, Ibach was sentenced seven months after *Dueñas* was decided, not before it was decided. These cases do not provide any reason, and we see no reason, to overlook Ibach's failure to object to the challenged fines and fees based on a purported inability to pay, particularly because his doing so would have allowed the trial court to efficiently address the issue. Therefore, we decline to exercise our discretion to consider his claim.

Second, Ibach contends the trial court's imposition of the challenged fines and fees constituted unauthorized sentences, the challenge to which cannot be forfeited under *People v. Scott* (1994) 9 Cal.4th 331. In *Scott*, our Supreme Court determined that "the 'unauthorized sentence' concept constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal," and explained that "a sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstances in the particular case." (*Id.* at p. 354.) We are not faced with such a sentence here. Ibach ignores that *Scott* recognized that forfeiture applies "to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" (*id.* at p. 353) and he also ignores the case law we have discussed

23

that allows forfeiture in circumstances similar to those before us.  Ibach's "unauthorized sentence" argument fails in light of this authority.

In short, Ibach has forfeited his appellate claims regarding the trial court's imposition of certain fines and fees.  In light of our conclusion, we will not address the merits of his claim.

## DISPOSITION

The judgment is affirmed.

_____

STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

*People v. Ibach*  (A158432)

25